**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILENE LIPPMAN, derivatively on behalf of ABBOTT LABRATORIES, | No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ROBERT B. FORD, ROBERT J. ALPERN, SALLY E. BLOUNT, PAOLA GONZALEZ, MICHELLE A. KUMBIER, DARREN W. McDEW, NANCY McKINSTRY, WILLIAM A. OSBORN, MICHAEL F. ROMAN, DANIEL J. STARKS, JOHN D. STRATTON, GLENN F. TILTON, ROGER BIRD, CHRISTOPHER J. CALAMARI, ROBERT E. FUNCK, JR., JOSEPH MANNING, and DANIEL SALVADORI, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| ABBOTT LABRATORIES, | |
| Nominal Defendant. | |

Plaintiff Ilene Lippman ("Plaintiff"), by and through the undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Abbott Laboratories ("Abbott" or the "Company") against certain current members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' misconduct alleged herein. Plaintiff makes the allegations within this Complaint based upon her personal knowledge as to herself and with respect to the remainder of the allegations, based upon discussions with and on the reliance of her counsel, including the pre-suit

investigation conducted by counsel, which included the Company's filings with the SEC, a whistleblower complaint that was later memorialized in a report in October 2021 (the "Report" attached hereto as Exhibit A and incorporated by reference), filings in legal and governmental actions, conference calls, announcements, press releases, corporate governance documents available on the Company's website, government and regulatory investigations, media reports and analysis of court filings in the related securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, styled *Pembroke Pines Firefighters & Police Officers Pension Fund v. Abbott Laboratories, et al.*, No. 1:22-cv-4661 (the "Securities Fraud Class Action"), currently pending in the United States District Court for the Northern District of Illinois..

## INTRODUCTION

1. Abbott operates in the highly regulated health care business. One of its business lines, Abbott Nutrition, is one of the country's largest infant formula manufacturers, making 48% of all infant formula sold in the United States. Abbott manufacturers the popular brand Similac and the amino-acid based formula EleCare, for which there is no store-brand alternative. Nearly half of Abbott's formula is produced in its manufacturing facility in Sturgis, Michigan ("Michigan plant"), meaning that Abbott's Sturgis-manufactured infant formula fed roughly one in six formula-fed babies in the United States.

2. Abbott's infant formula business is highly regulated and given the large market share the county is highly dependent on Abbott complying with federal regulations.

3. The Company is required to adhere to positive obligations under federal law and FDA regulations. The FDA regulations require all infant formula manufacturers to implement a system of controls to cover all stages of manufacturing, including specific controls to prevent adulteration of infant formula from microorganisms and bacteria. Additionally, the FDA requires

detailed record-keeping, including a requirement that manufacturers have procedures to address all written and oral complaints.

4.     Under these regulations manufactures must conduct an investigation when a complaint shows a possible health hazard, and the failure to conduct such an investigation renders infant formula produced under those conditions "adulterated" under the terms of the controlling statute.

5.     And Abbott was well aware of its regulatory responsibilities.  In its annual circulars and Environmental, Social, and Governance ("ESG") Global Reports, Abbott emphasized how its "nutrition business ensures food safety through a tightly controlled manufacturing process that encompasses all steps from accepting materials from suppliers through to final product distribution."  Abbott represented that "[w]e monitor and verify microbiology, packaging integrity, and nutrient and lot control.  We complete extensive finished product testing before releasing it for commercial distribution."  Moreover, Abbott promised investors and the public that any complaints of safety or other concerns would be fully investigated and brought to the attention of the Company's Chief Ethics Compliance Officer who in turn "monitors all government guidance."

6.     The FDA whistleblower filed a complaint in February 2021 (later memorialized in the Report) with the OSHA that OSHA delivered to Abbott and the FDA days later.

7.     Despite employee complaints detailed in the Report, and OSHA's involvement, the Company did nothing to resolve the hazardous conditions at the Michigan plant.  As a result, the formula produced at the Michigan plant ultimately resulted in serious illness and death of babies.

8.     A year after the initial whistleblower complaint, on February 17, 2022, the FDA publicly announced that it was investigating four consumer complaints of infant illness related to formula produced at the Michigan plant.  The FDA reported it initiated an onsite inspection at the

Michigan plant and found several positive contamination results from environmental samples for Cronobacter sakazakii ("Cronobacter"), a rare and deadly foodborne pathogen linked to infant illnesses and death.

9.     That same day, Abbott voluntarily recalled some of its most popular powdered formulas and shut down its Michigan plant.

10.     The shut-down resulted in a massive shortage of baby formula in the United States. A national crisis ensued as a result of the shut-down of this single plant.  This led to congressional hearings, lawsuits, and the invocation of the Defense Production Act to increase production and creating "Operation Fly Formula" to deploy Defense Department planes and speed formula shipments into the United States from overseas.

11.     The problems at the Michigan plant were no surprise to the Board and Company executives, as the Company was on notice of deficiencies of the plant through various employee complaints, and OSHA.

12.     The Board has a fiduciary duty to maintain a system of controls to ensure that its businesses complying with positive law.  However, the gross misconduct of employees at the Michigan plant demonstrate that the Board failed to maintain the required controls.

13.     In addition, Defendants throughout the Relevant Period[1] made and/or caused the Company to make false and misleading statements and omissions of material fact regarding the compliance with FDA regulations regarding the safety and sanitation of Abbott's Michigan plant and the actual risk of regulatory action, product recalls and plant shutdown.

14.     Plaintiff brings this action to redress the devastating harm that the Board and Abbott senior management have inflicted on the Company through their faithless behavior.

---

[1] The Relevant Period is February 19, 2021 through June 8, 2022.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for, *inter alia*, violations of Sections 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, and claims for contribution under Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f)(5)(A)-(D) and §78u-4(f)(8).

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this District because Abbott conducts business and maintains its principal executive offices in this District and one or more of the Defendants resides in this District. Further, Abbott engages in numerous activities and conducts business here, which had an effect in this District.

## THE PARTIES

### A.     Plaintiff

18.     Plaintiff is a shareholder of nominal defendant Abbott and has continuously held Abbott stock at all relevant times.

### B.     Nominal Defendant Abbott

19.     Nominal defendant Abbott is an Illinois Corporation with principal executive headquarters located at 100 Abbott Park Road, Abbott Park, Illinois 60064.  Abbott is one of the largest manufacturers of infant formula in the United States.  Abbott has over 1.7 billion common shares outstanding as of June 30, 2022.  Shares of Abbott's common stock are publicly traded on the New York Stock Exchange under the ticker symbol "ABT."

C.      **Individual Defendants**

20.      Defendant Robert B. Ford ("Ford") is Chairman of the Board and Chief Executive Officer ("CEO") of Abbott.  He assumed the role of Chairman in December 2021, having been appointed President and CEO in March 2020.  Ford is the Chair of the Executive Committee.

21.      Defendant Robert J. Alpern ("Alpern") has served as a director of Abbott since 2008.  Anderson serves on the Nominations and Governance and Public Policy Committees. Alpern is a professor at Yale School of Medicine.

22.      Defendant Sally E. Blount ("Blount") has served as a director of Abbott since 2011. Blout serves on the Board's Nominations and Governance and Public Policy Committees.  Blout is the President and CEO of the Catholic Charities of the Archdiocese of Chicago, and Professor and Former Dean at J.L. Kellogg Graduate School of Management.

23.      Defendant Paola Gonzalez ("Gonzalez") has served on the Board since 2021. Gonzalez served on the Audit Committee.  Gonzalez is the vice President and Treasurer of The Clorox Company.

24.      Defendant Michelle A. Kumbier ("Kumbier") has served as a director of Abbott since 2018.  Kumbier serves on the Audit and Compensation Committees.  Kumbier is President, Turf & Consumer Products at Briggs & Stratton, LLC.

25.      Defendant Darren W. McDew ("McDew") has served as a director of Abbott since 2019.  Darden serves on the Nominations and Governance and Public Policy Committees.  McDew is a retired General, U.S. Air Force, and Former Commander of U.S. Transportation Command.

26.      Defendant Nancy McKinstry ("McKinstry") has served as a director of Abbott since 2011.  McKinstry has served on the Audit (Chair), Compensation and Executive Committees. McKinstry is the CEO and Chairman of the Executive Board of Wolters Kluwer N.V.

27.     Defendant William A. Osborn ("Osborn") has served as a director of Abbott since 2008 and is the Company's Lead Independent Director.  Osborn serves on the Compensation, Nominating and Governance (Chair) and Executive Committees.  Osborn is the retired Chairman and CEO of Northern Trust Corporation.

28.     Defendant Michael F. Roman ("Roman") has served as a director of Abbott since February 2021.  Roman serves on the Audit and Compensation Committees.  Roman is Chairman, President, and CEO of the 3M Company.

29.     Defendant Daniel J. Starks ("Starks") has served as a director of Abbott since 2017.  Starks is a member of the Public Policy and Executive Committees.  Starks is the retired Chairman, President, and CEO of St. Jude Medical, Inc.

30.     Defendant John D. Stratton ("Stratton") has served as a director of Abbott since 2017.  Stratton is a member of the Audit and Public Policy Committees.  Stratton is the executive Chairman of Frontier Communications Parent, Inc.

31.     Defendant Glenn F. Tilton ("Tilton") has served as a director of Abbott since 2007.  Tilton is a member of the Audit, Public Policy (Chair) and Executive Committees.  Tilton is the retired Chairman, President, and CEO of UAL Corporation.

32.     Ford, Alpern, Blount, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Sparks, Stratton, and Tilton are collectively referred to herein as the "Board."

33.     Defendant Roger Bird ("Bird") is Abbott's Senior Vice President, U.S. Nutrition.  He was appointed to this role in February 2015.

34.     Defendant Christopher J. Calamari ("Calamari") is Abbott's President of Nutrition, North America, and Senior Vice President for U.S. Nutrition.  Calamari joined Abbott in 2005 and has served in a number of roles during his tenure, including Vice President for Pediatric Nutrition.

35.     Defendant Robert E. Funck, Jr. ("Funck") is Abbott's Chief Financial Officer ("CFO") and Vice President, Finance.  He was appointed to this role in March 2020.

36.     Defendant Joseph Manning ("Manning") is Abbott's Executive Vice President, Nutritional Products.  Manning assumed this role in December 2021.

37.     Defendant Daniel Salvadori ("Salvadori") is Abbott's Executive Vice President and Group President, Established Pharmaceuticals and Nutritional Products.  He was appointed to this role in December 2021.

38.     Defendants Bird, Calamari, Funck, Manning, and Salvadori are collectively referred to herein as the "Insider Trading Defendants," and together with the Board, are collectively referred to herein as the "Individual Defendants."

39.     Defendants Ford, Funck, Manning, and Calamari and currently named as defendants in the Securities Fraud Class Action and are collectively referred to herein as the "Contribution Defendants."

## STATEMENT OF FACTS

### A.     Overview of the Company

40.     Abbott provides a broad line of health care products, with four reporting segments: Nutritional Products, Established Pharmaceutical Products, Diagnostic Products, and Medical Devices.

41.     In 1964, Abbott acquired its infant formula business line through the acquisition of Ohio based Ross laboratories.

42.     Abbott has since rebranded its Ross subsidiary as Abbott Nutrition.

43.     Abbott manufactures nearly half of its infant formula at the Michigan plant.  Abbott manufactures, processes, packs, labels, holds and distributes infant formulas.

44. Abbott's infant formulas are marketed under several brand names throughout the United States, including: Similac®, Similac® 360 Total Care®, Similac Pro-Advance®, Similac® Advance®, Similac® Advance® Non-GMO, Similac Pro-Sensitive®, Similac Sensitive®, Similac Sensitive® Non-GMO, Go&Grow by Similac®, Similac® NeoSure®, Similac® Organic, Similac® Special Care®, Similac Total Comfort®, Similac® For Supplementation, Isomil® Advance®, Isomil®, Alimentum®, Gain™, Grow™, Similac En Mei Li™, and Eleva™.

45. Abbott also manufactures and sells adult and pediatric nutritional products such as: Ensure®, Ensure Plus®, Ensure® Enlive®, Ensure® (with NutriVigor®), Ensure® Max Protein, Ensure® High Protein, Glucerna®, Glucerna Hunger Smart®, ProSure™, PediaSure®, PediaSure SideKicks®, PediaSure® Peptide, EleCare®, Juven®, Abound™, Pedialyte® and Zone Perfect®; and nutritional products used in health care institutions including: Jevity®, Glucerna® 1.2 Cal, Glucerna® 1.5 Cal, Osmolite®, Oxepa®, Freego™ (Enteral Pump) and Freego™ sets, Nepro®, and Vital®.

46. These nutritional products collectively make up a significant portion of Abbott's revenues and earnings.

**B.      The Company's Positive Obligations Under the FDA Regulations**

47. Infant formula is a regulated food product that must be made in compliance with federal law.

48. Congress passed the Infant Formula Act of 1980, which created section 412 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C §321, *et seq*. ("the Act"). In 1986, Congress, as part of the Anti-Drug Abuse Act of 1986 (Pub. L. 99-570), amended section 412 of the Act to address concerns related to the sufficiency of quality control testing, current good manufacturing practices, recordkeeping, and recall requirements for infant formula.

49.     Section 412 of the Act (21 U.S.C. §350a) provides requirements relating to nutrient content, nutrient quantity, nutrient quality control, record-keeping and reporting, and recall of infant formulas.  In addition, Section 412 of the Act requires persons responsible for the manufacture or distribution of infant formula to register with FDA.

50.     Under the authority of the Act, the FDA has promulgated regulations that specify infant formula nutrient quality control procedures; records and reports; and submission requirements (21 C.F.R. §106); the labeling of infant formula; the terms and conditions under which certain infant formula may be exempt from some of the Act's requirements; nutrient specifications for infant formula; and infant formula recalls (21 C.F.R. §107).  In 2014, the agency revised its infant formula regulations (21 C.F.R. Parts 106 and 107) to establish quality factors, current good manufacturing practices, and revised quality control procedures.

51.     The FDA regulations are designed to ensure the safety of infant formula, and require manufacturers to implement a system of controls to cover all stages of manufacturing, including specific controls to prevent adulteration of infant formula from microorganisms and bacteria.

52.     Abbott is a major participant in the Special Supplemental Nutritional Program for Women Infants and Children (*i.e.*, the WIC Program) which provides rebates to manufacturers who supply infant formula to low-income women, infants and children who are facing nutrition risk.  The benefits of the program to Abbott are conditioned upon compliance with provisions of the Act, among other things.

**C.     The Michigan Plant had a Long History of Violations**

53.     Abbott bought its way into the infant formula market through the acquisition of Ross Laboratories in 1964.  Abbott, however, maintained the Ross subsidiary (which was later renamed Abbott Nutrition) separate from Abbott's system of internal controls.  Remarkably, the

Michigan plant relies on paper records for work orders and is was never integrated into Abbott's electronic system for internal controls.

54.     The Michigan plant has a history of ongoing safety issues of which the Company was aware but failed to adequately address.

55.     During a September 2019 inspection, the FDA found that Abbott detected Cronobacter in a batch of formula in August 2019, before distribution.  The FDA issued a notice to Abbott citing employee for failing to test fewer samples of a Similac batch for salmonella than company plans specified.

56.     In September 2021, the FDA learned that a Minnesota infant had been hospitalized for three weeks with the Cronobacter pathogen after consuming powdered infant formula manufactured by Abbott.

57.     The same week the FDA learned about the case, an inspector was sent to the Michigan plant.  The inspector found numerous violations of the federal regulations intended to prevent contamination with the bacteria.

58.     *The Wall Street Journal* reported FDA "found standing water in several spots in a building where liquid mix is converted to dry powder.  They observed an employee not using proper hygiene practices.  The FDA's review of Abbott's records showed that in June 2020 a finished product batch of Similac for Spit-Up NonGMO powder tested positive for Cronobacter, according to FDA records."

59.     Furthermore, employees at the Michigan plant had been complaining about violations for years.  The whistleblower, a former Abbott employee at the Michigan plant, was ultimately terminated for raising FDA compliance concerns.  Specifically, the whistleblower worked in Quality Systems at Abbott Nutrition.

60.     While employees had made complaints to management, those complaints were rarely pursued and employees fearing retribution often failed to pursue the issue further.

61.     On or about February 16, 2021, OSHA received the whistleblower's complaint detailing unsafe manufacturing practices at the Michigan plant, and according to published reports sent a copy three days later to the FDA and Abbott.

62.     The Report, which followed the initial complaint, noted that the Michigan plant was one of the highest paying and largest employers in the area and thus loss of one's job at the plant could have dire consequences.  With this in mind, employees were likely reticent to report violations that would only be met with consternation.

63.     The 34-page Report details a series of misrepresentations, blatant safety violations and a culture, directed from upper management, of seeking to hide regulatory violations from the FDA and the public.

64.     This culture of non-compliance was fostered by a system that rewarded managers for production over safety.  This system is in direct contravention to the DOJ's "guidance for evaluating a company's compliance program that '[a]nother hallmark of effective implementation of a compliance program is the establishment of incentives for compliance and disincentives for noncompliance.'"

65.     The Board failed to establish a system of controls that would allow for employee's complaints to be heard and reward management for acting on complaints to ensure compliance with federal law.  Rather, the Report noted "incentives relative to compliance are insignificant if not nonexistent at the Sturgis [Michigan] site."

66.     As a result, the Michigan plant operated in violation of federal law and regulations.

67.     The Report outlined a series of compliance deficiencies at the Michigan plant and a concerted effort to keep the FDA in the dark about the safety of the infant formula produced there.  The Report noted that "active efforts were undertaken and even celebrated during and after the 2019 FDA audit to keep the auditors from learning of certain events believed to be associated with the discovery of micros in infant formula at the Sturgis site."  This is because a "culture of compliance does not exist at the Sturgis site as mandated by the FDA and the Department of Justice's guidance."

68.     The Report notes that records were falsified, formula was distributed without testing and the Company failed to take corrective measures, explaining that "Officials at the division level were aware of many of the problems and failed to take corrective measures. Corporate policies and practices were and are clearly inadequate.  Indeed, there is evidence that some officials at the division and corporate level may be complicit."

69.     Notably, the whistleblower explained that the Michigan plant continues to be run by the individuals who were once at Ross and long-time social friends remain in oversight roles where they seek to protect one another rather than address the concerns at the Michigan plant.

70.     The Report shows that the problems at the Michigan plant started at least as early as 2019.  In 2019, Abbott recalled a batch of Calcilo XD for discolored powder and rancid smell caused from the powder being in the seam of the formula can.  As a result, the Michigan plant was required to increase seam testing.  However, "instead of directly addressing the underlying problem, seam checks were performed on empty cans.  Performing seam checks on empty cans was the only way to achieve passing results without finding powder in the seam.  Management at the Sturgis site directed that the checks be performed in this manner."

71.     In addition, "[d]uring the week of August 17, 2020, and possibly earlier, seam integrity issues were discovered in multiple batches of Similac Sensitive for Spit Up." The whistleblower indicated that management at the Michigan plant "intentionally misrepresented the severity of the issue to division officials" and while months later some of the formula still at the Michigan plant was destroyed, the batches already shipped were never recalled.

72.     The whistleblower understood "that Abbott has been made aware of credible information that corroborates the concerns raised. However, to date, no serious effort has been undertaken to address these concerns. One report suggests a greater interest at the corporate level of identifying the sources of complaints as opposed to addressing the underlying concerns raised."

**D.     Infant Formula Violations are not the First Food Safety Violations at Abbott**

73.     The Board knew that oversight it nutrition division was crucial to ensure safety of it customers and avoid government violations.

74.     Indeed, Abbott had a long history of violations of which the Board was or should have been aware, including:

a.     In 1996, Abbott entered into a consent order with the Federal Trade Commission which had alleged in a complaint that Abbott had misrepresented the results of a survey of doctors as to recommendations of Abbott's Ensure, an adult nutrition supplement and the nutritional value of Ensure. The Consent Order would automatically terminate after 20 years, or 2016 if there were no violations of the FTC consent decree.

b.     In 1999, Abbott and the FDA entered into a consent decree "to ensure [Abbott's] diagnostic manufacturing processes in Lake County Illinois conform with FDA's current Quality Systems Regulation." Among other directives in the decree, Abbott agreed to pay

$100 million, constituting approximately 18% of Abbott's net earnings that quarter (ended September 30, 1999).

       c.     In 2010, the Michigan plant had a beetle infestation which led to recalls and shut down of the Plant.  Report at 20, n. 57.

     **E.**     **The Individual Defendants are Responsible for Protecting Abbott and Ensuring that the Company Complies with FDA Regulations**

75.     The Individual Defendants, as directors and/or officers of Abbott, owe or owed fiduciary duties to the Company during their tenures.  Illinois law imposes fiduciary obligations on directors of Illinois corporations such as Abbott.

76.     By reason of their positions as officers, directors, and fiduciaries of Abbott and because of their ability to control the business and corporate affairs of Abbott and its subsidiaries, the Individual Defendants owed Abbott and its shareholders fiduciary obligations of care, good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Abbott in a fair, just, honest, and equitable manner.

77.     Individual Defendants were and are required to act in furtherance of the best interests of Abbott and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Abbott and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

78.     To fulfill their responsibilities and duties, the directors and officers of Abbott must supervise and manage Abbott's policies, controls, and compliance with applicable controlling statutes.

79.     Abbott's directors are each made aware of their duties and responsibilities when, as new Board members, they are required to undergo training and education on fiduciary obligations.   Specifically, Abbott's governance guidelines require new directors to attend a Director Orientation:

> Following their election, every newly elected member of the board of directors shall participate in an orientation program established by Abbott.   This orientation program shall include presentations designed to familiarize directors with Abbott and its strategic plans, its significant financial, accounting and risk management issues, its Code of Business Conduct, compliance programs and other controls, its senior management, and its internal and independent auditors.   The program shall also address procedures of the board of directors, directors' responsibilities, the board's Governance Guidelines and board committee charters.

80.     In addition, members of the Board are encouraged to participate in Continuing Education:

> The board of directors encourages its members to participate in continuing education programs sponsored by universities, stock exchanges or other organizations or consultants specializing in director education.   Directors may attend continuing education programs at Abbott's expense.

81.     In addition, the oversight and management obligations of the Company's directors and officers require them to know of and oversee compliance with various laws and regulations that apply to Abbott's business.   Because Abbott's ability to manufacture infant formula and participate in that lucrative and integral aspect of the supply chain depends on the Company's adherence to the FDA's requirements, the Company's directors have a positive fiduciary obligation to oversee and monitor the Company's compliance programs and other internal controls, in order to ensure that the Company is effectively guarding against known compliance risks.

33.     Abbott described in the 2020 ESG Global Sustainability Report that "Abbott's nutrition business ensures food safety through a tightly controlled manufacturing process that encompasses all steps from accepting materials from suppliers through to final product

distribution. We monitor and verify microbiology, packaging integrity, and nutrient and lot control. We complete extensive finished product testing before releasing it for commercial distribution."

34. Abbott's 2020 ESG Global Sustainability Report also touted the Company's Code of Business Conduct and strict compliance procedures that enabled employees to "report any concerns" because "Abbott does not tolerate illegal or unethical behavior in any aspect of our business and that employees are required to ask questions and/or report any concerns." The Company also stressed that it did not tolerate any retaliation against employees who reported concerns:

> Process for Reporting Concerns
>
> Our Code of Business Conduct emphasizes our employees' responsibility to report concerns. This requires us to create an environment where they can do so in good faith, without fear of retaliation. The code outlines Abbott's responsibilities for handling employee grievances and complaints in an ethical way, and it strictly forbids any retaliation against any person who raises a complaint.
>
> We have clearly defined systems and processes for asking questions and reporting suspected or actual violations of our code, policies or procedures. These include our Speak Up tool, which allows employees and external parties to raise concerns of potential misconduct in a manner that is confidential and (where permitted) anonymous, either by email, by telephone or through a website.
>
> The Ethics and Compliance Officer for Investigations enters every report that is received into the investigations database or delegates somebody else to do so. This person assigns an investigator from the appropriate function to gather evidence so that the OEC can determine if action is required. We aim to conduct investigations as quickly as possible without compromising thoroughness and integrity, and we carry out periodic audits of the investigations process.

82. Abbott has delineated the roles of its officers and directors in compliance with its Code of Business Conduct, charters of Board committees, and other documents.

83.     Abbott's Director Code of Business Conduct imposes numerous requirements on

members of the Board:

COMPLIANCE WITH LAWS.

Directors shall comply with all laws, rules and regulations applicable to their
capacity as directors of Abbott, including, among others, the insider trading laws,
rules and regulations.

REPORTING OF ANY ILLEGAL OR UNETHICAL BEHAVIOR.

Directors shall report violations of laws, rules, regulations or the Code of Business
Conduct to the Chairman of the Board, the Chief Executive Officer, the Vice
President and Chief Ethics and Compliance Officer, or any other appropriate
Abbott personnel.

84.     In addition to the Director specific Code of Business Conduct, the Company has a

Code of Business Conduct that governs the behavior of all employees.  The Code of Business

Conduct states in part:

It is up to every person working for Abbott – at all levels of the organization – to
uphold the Abbott values (Pioneering, Achieving, Caring and Enduring) and
operate with honesty, fairness, and integrity.

***

The fundamental message of the Code is straightforward: It's up to each of us, as
Abbott employees, to build our company and our brand by holding ourselves to the
highest ethical standards and by operating with honesty, fairness, and integrity.

***

We endeavor to maintain the highest level of quality throughout our business.  This
effort starts with the sourcing of materials and the manufacture of our products and
moves through how we market, sell, and supply our products, including through
our business partners – delivering high quality is imperative every step of the way

***

We are committed to timely identifying, evaluating, and addressing product safety
issues.

***

18

Abbott's activities conform to the regulatory licenses and approvals we obtain from government agencies such as Ministries of Health, or Food and Drug authorities, to promote, sell, and import pharmaceuticals, medical devices, and other products. We comply with each country's laws and regulations that govern how, where and when we are permitted to promote our products, such as the United States Federal Food, Drug, and Cosmetic Act. We maintain and follow internal policies and procedures designed to ensure compliance with such requirements and with respect to government health care programs.

\*\*\*

Managers and supervisors, as leaders in the organization, must demonstrate a strong commitment to our values and lead by example. They must always promote and support ethical behavior by employees. Managers must help ensure that employees understand their responsibility to abide by this Code and must foster a work environment that allows employees to feel comfortable asking questions and voicing concerns without fear of retaliation.

\*\*\*

Retaliation, such as by intimidating, threatening, harassing or maligning any person who has reported a violation or potential violation in good faith.

It is never acceptable to retaliate against anyone who raises concerns about whether business activities are in line with the Code. Alleged retaliation should be reported to the Office of Ethics and Compliance or Human Resources.

Our commitment to the work that we do drives us to not just follow the letter of the laws that apply to our work, but to be mindful of the ethical expectations that come with being a leader in a business like ours.

\*\*\*

Every Abbott employee is expected to adhere to all laws and Abbott's policies, procedures, principles and standards, including this Code. This is a fundamental expectation and condition of employment.

85.     Various Board committees are similarly responsible for the oversight of compliance with applicable laws. For example, the charter for the Public Policy Committee states in pertinent part:

The Public Policy Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to:

• public policy, regulatory (including regulation by the Federal Food and Drug Administration (FDA), as well as other domestic, foreign and international regulatory bodies) and government affairs; and

• healthcare and other compliance issues (recognizing that other Board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance).

*\*\**

Review and evaluate Abbott's policies and practices with respect to maintaining legal, regulatory and healthcare compliance (recognizing that other Board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), and review them with the Board as appropriate.

Review and discuss with management healthcare and regulatory compliance matters, including product cybersecurity and data privacy. In particular, the Chief Ethics and Compliance Officer shall report to the Public Policy Committee at least three (3) times a year regarding healthcare and regulatory compliance matters, and the state of regulatory compliance and issues with respect thereto; any additional reports or discussions may be scheduled as the Public Policy Committee determines are necessary and appropriate.

Review annually Abbott's compliance program with respect to legal and regulatory requirements, including FDA regulations, and receive a report from the corporate officer responsible for quality assurance as needed, but at least two (2) times a year, regarding any FDA warning letters and Abbott's responses, as well as any upcoming compliance initiatives.

86.     The Executive Committee, in addition, may exercise all the authority of the Board in the management of Abbott. Thus, the Executive Committee similarly is tasked with oversight of management's actions to comply with the Act and FDA regulations.

**F.      The Board Ignored Repeated Red Flags of FDA Compliance Failures**

87.     Despite the Company's positive obligation under federal law and FDA regulations the Board has failed to set up a system of controls to ensure compliance. Further, despite its lip service to encouraging employees to report safety compliance violations, it has failed to ensure its management team was adhering to these policies and effectively protecting the Company and the customers it serves.

20

88.     Rather, as demonstrated in the Report, management was made aware of safety violation and sought to silence employees making such complaints rather than fixing these violations.

89.     Further, in an effort to protect themselves, executive management has falsely denied knowledge of employee complaints, including the whistleblowers complaints until April 2022.

90.     On May 25, 2022, Defendant Calamari testified on behalf of Abbott at a hearing concerning the baby formula shortage held by the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. During his testimony, Calamari repeatedly stated that Abbott was unaware of the whistleblower's complaints until late April 2022, when the complaint submitted to the FDA was publicly disclosed by a member of Congress. For example, Calamari stated:

> Abbott did not find out about it [the whistleblower complaint] until it was made public in the end of April and it was the particular individual who raised the complaint . . . it was their choice to use that mechanism to raise the complaint.

91.     However, the whistleblower had filed a similar complaint with OSHA in February 2021 that was contemporaneously sent to Abbott and to which Abbott filed a non-public response in April 2021.

92.     The Board's failure to ensure its representative it sent to testify before Congress provided truthful testimony further evidences that they have been asleep at the switch both prior to and following the public disclosure of the safety violations at the Michigan plant.

**G.      Materially False and Misleading Statements**

93.     Throughout the Relevant Period, the Individual Defendants made and/or failed to correct numerous materially false and misleading statements and/or material omissions that concealed the "egregiously unsanitary" conditions at the Michigan plant, the extent to which those

issues were kept from regulators and the public, and the impact of those issues on Abbott's business.

94.      On February 18, 2022, Defendants Ford, Alpern, Blount, Boudreau, Funck, Gonzalez, Kumbier, McDew, McKinstry, Osborn, Roman, Sparks, Stratton and Tilton signed Abbott's materially false and misleading Annual Report on SEC Form 10-K for the period ending December 31, 2021 (the "2021 10-K")..  The 2021 10-K disclosed that the Company is subject to stringent government regulations including oversight by the FDA, yet it made no disclosure of Abbott's non-compliance with these regulations at its Michigan plant.

95.      On March 18, 2022 the Board caused Abbott to issue its annual Proxy Statement that similarly concealed information about the problems and investigations at the Michigan plant.

96.      On April 20, 2021, the Company held its first-quarter 2021 earnings conference call.  During the call, Defendant Ford told investors: "In the US and several international markets, we continue to capture share with our leading portfolio of infant formula and toddler brands."  But Ford failed to inform investors that the vast majority of this market was at risk for being shut down because of safety violations.

97.      On July 16, 2021, Abbott issued its 2020 ESG Global Sustainability Report.  The 2020 ESG Sustainability Report noted "Abbott's nutrition business ensures food safety through a tightly controlled manufacturing process that encompasses all steps from accepting materials from suppliers through to final product distribution.  We monitor and verify microbiology, packaging integrity, and nutrient and lot control.  We complete extensive finished product testing before releasing it for commercial distribution."

98.      Abbott's 2020 ESG Global Sustainability Report also touted the Company's Code of Business Conduct and strict compliance procedures that enabled employees to "report any

concerns" because "Abbott does not tolerate illegal or unethical behavior in any aspect of our business and that employees are required to ask questions and/or report any concerns." The 2020 ESG Global Sustainability Report made no mention of the OSHA complaint.

99.     On July 22, 2021, Defendants Ford and Funck held the second-quarter 2021 earnings conference call. During the call, Ford told investors: "In Pediatric Nutrition, sales grew nearly 4.5% in the quarter, led by growth of nearly 9% in the US, where we continue to capture share with our leading portfolio of infant formula and toddler brands." Once again, the safety violations at the Michigan plant were not disclosed.

100.     On October 20, 2021, the Company held its third-quarter 2021 earnings conference call. During the call, Ford told investors:

> I'll now summarize our third quarter results ... I'll start with Nutrition where sales increased 9% compared to last year. Strong growth in the quarter was led by US Pediatric and International Adult Nutrition. In Pediatric Nutrition, sales grew over 8.5% in the quarter, led by strong growth in the US from continued share gains in our infant formula and toddler portfolio.

101.     On January 26, 2022, the Company held its fourth-quarter and year-end 2021 earnings conference call. Defendants Ford and Funck both were on the call with investors where the importance of the Company's infant formula business was touted:

> In Pediatric Nutrition, US sales growth of more than 10% for the year was led by strong growth of Pedialyte, our oral rehydration brand, and market share gains for Similac, our market leading infant formula brand. During the past year, we continued to expand our Nutrition portfolio with several new product and line extensions including the launch of Similac 360 Total Care in the US and continued global expansion of our PediaSure, Glucerna and Ensure brands with line extensions such as plant-based, lower sugar and high protein products.

102.     The above statements were materially false and misleading and/or omitted information necessary to make the statements not materially false and misleading. The Individual Defendants were aware of, but failed to disclose, the existence of manufacturing process and contamination issues with its infant formula products which were related to infant deaths. In

addition, the violations of applicable health and safety regulations at Abbott's Michigan plant caused massive product recalls, exposed the Company to regulatory investigation and censure, as well as potential class-wide liability in the Securities Fraud Class Action.

103. Even in finally addressing the infant formula issues, Defendants sought to mislead. The Company's February 17, 2022 press release announcing the recall of Abbott's powdered infant formula, claimed that Abbott was "initiating a proactive, voluntary recall of powder formulas, including Similac, Alimentum and EleCare manufactured in Sturgis, Mich., one of the company's manufacturing facilities." In addition, in the press release, Manning stated: "We know parents depend on us to provide them with the highest quality nutrition formulas. We're taking this action so parents know they can trust us to meet our high standards, as well as theirs. We deeply regret the concern and inconvenience this situation will cause parents, caregivers and health care professionals." The Company failed to disclose, however, that the recall was made at the insistence of the FDA based on information that was known to the Individual Defendants for at least a year.

104. The February 17 press release reported that evidence of Cronobacter contamination was found in "nonproduct contact areas" when, in fact, the FDA that the contamination was found in areas directly contacting infant formula containers and the formula product.

## H.     The Board's Failure to Oversee its Infant Formula Business Led to Infant Illness and Death and Significant Harm to the Company

105. After reports of the first three infant Cronobacter illnesses and the Report, FDA inspectors returned to the Michigan plant in late January 2022 and found Cronobacter on several surfaces, including the cover of a hopper that held scoops to be placed in formula cans. The FDA also once again found standing water and improper employee hygienic practices.

24

106. The FDA's inspection was still under way when Abbott agreed to halt production and issue a recall in February 2022.

107. February and March 2022 FDA inspections resulted in another notice from the FDA, highlighting Company records from 2021 that showed cracks in the dryer equipment, which creates potential for harboring bacteria.

108. In total the FDA inspections between January 31, 2022 and March 18, 2022 found five environmental subsamples collected from the Michigan plant to be positive for Cronobacter.

109. On May 16, 2022, the DOJ filed a proposed consent decree in federal court that outlined the steps the Company would need to take to reopen the Michigan plant.

110. On May 17, 2022, a federal judge entered the 33-page agreement that required Abbott to (i) clean and sanitize the Michigan plant and all the equipment in it; (ii) hire an independent third-party expert to review its processes; and (iii) review and change its environmental monitoring program, its product sampling and testing plans, and its employee training programs.

111. On May 24, 2022 the FTC announced it had launched an investigation into Abbott and the supply chain issues surrounding the concentration of infant formula in so few locations.

112. On May 25, 2022, the House Energy and Commerce Oversight and Investigations subcommittee held a hearing to investigate Abbott's failure to comply with federal laws and regulations to keep infant formula free from bacteria.

113. Calamari, president of U.S. and Canada nutrition for Abbott, apologized for Abbott's role in the infant shortage during the hearings but failed to address questions about the consequences that would happen as a result of the lax safety precautions at the Michigan plant.

114.    Dr. Robert Califf, the head of the FDA, also testified telling representative that the Michigan plant had a leaking roof, water pooled on the floor and cracks in key production equipment that allowed bacteria to get in and persist.  Califf told Congress that the Michigan plant was "egregiously unsanitary."

115.    "Frankly, the inspection results were shocking," Califf told members of the House Energy and Commerce Subcommittee on Oversight and Investigations.  "We had no confidence in integrity of the quality program at the facility."  Califf testified that the FDA worked with DOJ officials to dictate steps the company needed to take to turn the facility around.

116.    On June 4, 2022, Abbott said that it had resumed production of EleCare at the Michigan plant for an expected release to consumers around June 20, 2022 and that it was "working hard" to restart production of Similac and other formulas.

117.    On June 8, 2022, *The Wall Street Journal* reported Abbott was alerted to the safety violations far earlier than initially reported.  Prior to going to the FDA, the whistleblower filed a complaint with OSHA in February 2021.  That complaint was contemporaneously provided to Abbott.

118.    Abbott responded to the complaint proving its actual knowledge of the concerns raised therein.  However, rather than addressing the issues, Abbott sough to cast aspersions at the whistleblower and continue its practice of hiding problems at the Michigan plant.

119.    Defendant Calamari, as Abbott's senior vice president of U.S. nutrition, however, testified before Congress that the Company learned of the complaint sent to the FDA when it was made public by Congress in late April 2022 and failed to disclose the February 2021 OSHA complaint.

120.    *The Wall Street Journal* also reported that the whistleblower filed an earlier complaint with Michigan OSHA after he was terminated in August 2020.

121.    On June 16, 2022, the Michigan plant shut down once again.  While Abbott allegedly replaced the leaking roof and floor, severe flooding from storm damage still managed to once again shut down the Michigan plant.

122.    The Michigan plant reopened again on July 1, 2022.

123.    The breaches of fiduciary duty by the Individual Defendants occurring have exposed and will continue to expose the Company to potentially millions of dollars in losses, expenses, and reputational harm.

124.    The Company acknowledges "Abbott's reputation is one of its greatest assets." This asset has been significantly damaged by the Individual Defendants actions in failing to properly ensure the Michigan plant was operating in compliance with the Act and FDA regulations.

125.    As a direct and proximate result of the Individual Defendants' misconduct, Abbott has sustained millions of dollars in harm.  Because of Abbott's violations at the Michigan plant, Abbott, and others, have been named as defendants in wrongful death actions resulting from Similac contamination: *Restad v. Abbott Laboratories, Inc*., No. 1 :21-cv-00798-A WI-SKO (E.D. Cal.); and from Alimentum contamination: *Diebert v. Abbott Laboratories Inc*., No. 1 :22-cv-01114-REB (D. Colo.) and the Securities Fraud Class Action.  Abbott has had to close the Michigan plant and to recall products manufactured there.  Defendants' actions also caused Abbott to waste hundreds of millions of dollars on repurchasing its own stock through 2021 and the first quarter of 2022.

126.    In addition, the Company is not only paying the cost of defending itself in the Securities Fraud Class Action and other actions, but it is exposed to massive potential liability for

class-wide damages, especially in light of the recall. The Company has also incurred costs and expenses in connection with the whistleblower complaint and the regulatory proceedings.

127.     The Company has and will continue to incurred costs stemming from, among other things, legal fees relating to civil litigation, and congressional and regulatory investigations and increased compliance costs.

### I.     Insider Selling by Abbot Executives

128.     While the Company's public stockholders lost value, the Insider Selling Defendants did quite well for themselves by using material nonpublic information ("MNPI") of Abbott to sell their Abbot stock before the stock price fell.  While some stock sales may have been made pursuant to various 10b5-1 plans for the respective Insider Selling Defendants, those 10b5-1 plans do not provide a defense or immunity here where the plan was adopted while the seller was already in possession of MNPI or made the sale in bad faith as is alleged herein.

129.     Defendant Bird sold 10,552 shares of his personally held Abbott stock for proceeds of $1,151,558 in March and April 2021 while in possession of MNPI about the conditions at the Michigan plant.  Bird did not purchase any Abbott stock during the Relevant Period.

130.     Defendant Calamari sold 3,074 shares of his personally held Abbott stock for proceeds of $373,280.78 in February and March 2022 while in possession of MNPI about the conditions at the Michigan plant.

131.     Defendant Funck sold 20,886 shares of his personally held Abbott stock for proceeds of $2,548,242.38 in February 2021 and February 2022 while in possession of MNPI about the conditions at the Michigan plant.

132.     Defendant Manning sold 34,483 shares of his personally held Abbott stock for proceeds of $4,221,672,96 in February 2021 and February 2022 while in possession of MNPI about the conditions at the Michigan plant.

133. Defendant Salvadori sold 120,214 shares of his personally held Abbott stock for proceeds of $16,471,365 in March 2021, December 2021, and March 2022 while in possession of MNPI about the conditions at the Michigan plant.

134. All of these insider sales were motivated at least in part by knowledge of MNPI and permitted the Insider Selling Defendants to achieve personal financial gains. Those gains were based on misappropriation of the Company's asset, *i.e*., the Company's MNPI, and are subject to disgorgement for the benefit of the Company even where the Company as not incurred any loss from the insiders' misuse of MNPI.

## DEMAND ON THE BOARD IS EXCUSED AS FUTILE

135. Plaintiff brings this action derivatively in the right and for the benefit of Abbott to correct the breaches of fiduciary duty by the Individual Defendants.

136. Plaintiff will adequately and fairly represent the interests of Abbott and its shareholders in enforcing and prosecuting this type of action.

137. Plaintiff did not make a demand on the Board prior to initiating this action because such a demand would have been a futile, wasteful, and useless act because a majority of the Board would have been interested in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Abbott's improper misconduct.

138. This case implicates the Board's facilitation of unlawful activity, including knowingly and consciously presiding over the Company's systematic violations of the Act and FDA regulations. The Board implemented and oversaw a business strategy that resulted in widespread and repeated violations of the law. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.

139.    The Board knew it was subject to FDA oversight and that safety violations could result in severe punishment.  The Board was not blamelessly unaware of the conduct leading to shut down at the Michigan plant.  Rather, it ignored red flags that ultimately led to infant deaths, a national infant formula shortage and corporate harm.

140.    Demand is also excused because the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.  A majority of the Board served as directors of the Company during some or all of the wrongdoing alleged herein, and each member of the Board knew of the wrongdoing but failed to act in the face of a known duty to act.  For these reasons, a majority of the Board faces a substantial likelihood of liability for their participation in the illicit acts.

141.    The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law can only have been a result of knowing breaches or reckless disregard for one's fiduciary duties.  The Board failed to take appropriate remedial action and that failure to take any action resulted in substantial corporate losses.  For these reasons, the decisions to not act was not made in good faith and was contrary to the best interests of the Company.  All of the Individual Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight.

142.    Ford is the Chairman of the Board and CEO of Abbott, and in that capacity, he receives substantial monetary compensation and other benefits.  Abbott admits in its annual proxy statement filed with the SEC and other public filings that Ford is not independent.  Kaufmann thus lacks independence, rendering him incapable of impartially considering a shareholder demand to commence and vigorously prosecute this action.

143. Tilton, Alpern, Blount, McDew, Starks, and Stratton are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Public Policy Committee. These individuals have served on the Public Policy Committee at all relevant times. As set forth above, the Public Policy Committee's charter imposes specific duties on members of this committee to ensure compliance with laws, regulations, and internal policies. These individuals violated their fiduciary duties to act in good faith to address the violations of law complained of herein.

144. Ford, McKinstry, Osborn, Starks, and Tilton are further conflicted from considering demand because they each face a substantial likelihood of liability as a result of their conduct on the Executive Committee. These individuals have served on the Executive Committee at all relevant times. As set forth above, the Executive Committee is directly charged with the oversight of management, which necessarily includes the oversight of management's compliance with the Act and FDA regulations.

145. As a result of the foregoing, the vast majority of the Board, at least eight of the ten members, face a substantial likelihood of liability.

146. As alleged herein and based on the duties imposed pursuant to the Company's corporate governance documents and applicable federal and state law, the Individual Defendants were aware of indicators and warnings that necessarily informed them of the legal violations taking place within the Company. Notwithstanding these warnings, the Individual Defendants wholly failed to provide oversight for years. Given the duties placed on the Board, to the extent any of the Individual Defendants did not have actual knowledge of the repeated violations of the drug distribution and reporting laws taking place within the Company, and the nationwide opioid

epidemic and state and federal lawmakers' focus on regulation, such lack of knowledge could only be the product of willful disregard or recklessness that constitutes bad faith breaches of their duties.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

147.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

148.    The Individual Defendants all owed and owe fiduciary duties to Abbott as directors and/or officers of the Company.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Abbott the highest obligation of good faith and loyalty in the administration of the affairs of Abbott, including assuring that the Company complied with federal laws governing, among other things, the distribution or diversion of particular controlled substances and reporting of suspicious orders of controlled substances.  The Board in particular also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Abbott alleged herein.

149.    The Individual Defendants willfully and/or recklessly ignored their obligations under federal law, Abbott's internal controls, and numerous warnings and government investigations and inquiries specifically relating to safety violations at the Michigan plant.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

150.    The Individual Defendants consciously violated their corporate responsibilities by affirmatively and repeatedly declining to stop and prevent Abbott from failing to maintain effective controls to ensure the Company was in compliance with the Act and FDA regulations.  The

Individual Defendants consciously violated their corporate responsibilities by ignoring red flags and failing to ensure that Abbott complied with its affirmative duty to implement and comply with applicable law.

151. The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Abbott in a manner consistent with the duties imposed upon them by law.

152. By committing the misconduct alleged herein, the Individual Defendants breached their duties of loyalty in the management and administration of Abbott's affairs and in the use and preservation of the Company's assets.

153. As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Abbott has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the substantial penalties, fines, sales suspension, and expenses described herein.

154. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST THE CONTRIBUTION DEFENDANTS FOR CONTRIBUTION UNDER 15 U.S.C. §78u-4(f)(5)(A)-(D) and §78u-4(f)(8)

155. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156. Plaintiff asserts this Count against the Contribution Defendants who are or will be named in the future as defendants in the Securities Fraud Class Action. By their disloyal acts and

violation of the federal securities laws, the Contribution Defendants exposed the Company to significant liability in the Securities Fraud Class Action.

157.    The Contribution Defendants are liable under Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f)(5)(A)-(D) and §78u-4(f)(8), which provide for claims of contribution.

158.    The Company is named as a defendant in the Securities Fraud Class Action based on alleged of violations of Section 10(b) of the Exchange Act.  The Company is alleged in the Securities Fraud Class Action to be directly liable to purchasers of Abbott public securities by virtue of many of the same facts alleged herein.  That lawsuit has caused and will continue to cause the Company to incur substantial costs for defense and settlement.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Contribution Defendants, who have caused the Company to suffer substantial harm through their disloyal acts in violation of the federal securities laws.  The Company is entitled under 15 U.S.C. §78u-4(f)(5)(A)-(D) and §78u-4(f)(8) to contribution and indemnification from the Contribution Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

159.    As officers and/or directors of the Company, the Contribution Defendants had the power to ability to, and did, control over influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and has the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

160.    The Contribution Defendants have damaged the Company and are liable to the Company for contribution and/or indemnification.  No adequate remedy at law exists for Plaintiff.

## COUNT III

### AGAINST THE CONTRIBUTION DEFENDANTS FOR
### VIOLATIONS OF 15 U.S.C. §78(j) AND 17 C.F.R. §240.10b-5

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    The Contribution Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5 and are currently facing such claims in the Securities Fraud Class Action.

163.    The Contribution Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

164.    The Contribution Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts practices and a course of business that operated as a fraud or deceit upon the Company and its shareholders.

165.    The Contribution Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Abbott were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

166.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Abbott, their control over, and/or receipt and/or modification of Abbott's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Abbott, participated in the fraudulent scheme alleged herein.

167.    As a result of the foregoing, the market price of Abbott common stock was artificially inflated during the Relevant Period. In ignorance of the falsity of the statements, stockholders, including Plaintiff, relied on the statements described above and/or the integrity of the market price of Abbott common stock in purchasing Abbott common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

168.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Fraud Class Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act and SEC Rule l0b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Fraud Class Action.

169.    The Contribution Defendants have damaged the Company and are liable to the Company for contribution and/or indemnification.  No adequate remedy at law exists for Plaintiff.

### COUNT IV

### AGAINST THE INSIDER SELLING DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY AND DISGORGEMENT

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    By virtue of their positions as officers the Insider Selling Defendants owned fiduciary duties of loyalty and good faith to the company.

172.     At the time the Insider Selling Defendants initiated their sales of Abbott stock, they knew MNPI that the Michigan plant had substantial defects, violations, and would close or was at risk of being closed.  The Insider Selling Defendants knew these conditions, and the likelihood of having to shutter the Michigan plant, thereby severely undercutting potential revenue, were in direct conflict with the bullishness publicly expressed to the market weeks and months earlier.

173.     The Insider Selling Defendants also knew that this was information that the market would consider material and that the announcement of the contaminated formula was virtually certain to harm the Company's stock price.  Despite being in possession of this MNPI, the Insider Selling Defendants sold substantial Abbott stock during the Relevant Period, in violation of their fiduciary duties.

174.     By disposing of their stock while in possession of adverse, MNPI, the insider selling defendants exploited their position at Abbott, and breached their fiduciary duties to Abbott. Because the Insider Selling Defendants sold their stock before the non-public information in their possession could be fully disclosed to the public and harm the Company's stock price, the insider selling defendants improperly benefited from this breach of fiduciary duty.

175.     The MNPI was a proprietary asset belonging to Abbott and was wrongly used by the Insider Selling Defendants used for their own benefit.

176.     The Insider Selling Defendants, as disloyal fiduciaries who wrongly used Abbott's MNPI for their own benefit, must disgorge to Abbott all trading profits and any profits derived from such profits even in the absence of any harm to Abbott.

177.     Plaintiff, on behalf of Abbott, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law and demand on the Board is excused;

B.      Awarding against all Individual Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Individual Defendants' violations set forth above, jointly and severally, together with pre-judgment and post-judgment interest thereon;

C.      Awarding to Abbott restitution from the Individual Defendants, and ordering disgorgement of all unjust profits, benefits, and other compensation obtained by Individual Defendants and all trading profits and any profits on profits obtained by the Insider Selling Defendants;

D.      Awarding Abbott contribution from the Contribution Defendants for all costs incurred by Abbott in connection with the Securities Fraud Class Action;

E.      Awarding Abbott equitable or injunctive relief as permitted by law or equity, including attaching, impounding or imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that Plaintiff, on behalf of Abbott, has an effective remedy;

F.      Ordering Abbott to take all necessary actions to reform and improve its corporate governance and internal processes to comply with the Company's governance obligations, and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events contained of herein;

G.      Awarding to Plaintiff the cost and disbursements of the action, including reasonable attorney's fees, experts' fees, costs, and expenses; and

H.     Granting such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims asserted herein.

Dated: January 17, 2023

                                       **GRANT & EISENHOFER P.A.**

                                       By:_ _____
                                       Lisa B. Weinstein, lweinstein@gelaw.com
                                       William Moore, wmoore@gelaw.com
                                       30 N. LaSalle Street, Suite 2350
                                       Chicago, IL 60602
                                       Tel: 312-610-5350

                                       **GRANT & EISENHOFER P.A.**
                                       Michael J. Barry, mbarry@gelaw.com
                                       123 Justison Street
                                       Wilmington, DE 19801
                                       Tel: 302-622-7000

                                       **GARDY & NOTIS, LLP**
                                       Mark C. Gardy, mgardy@gardylaw.com
                                       James S. Notis, jnotis@gardylaw.com
                                       Jennifer Sarnelli, jsarnelli@gardylaw.com
                                       126 East 56th Street, 8th Floor
                                       New York, NY 10022
                                       Tel: 212-905-0509

                                     *Counsel for Plaintiff*

## VERIFICATION

I, Ilene Lippman, hereby declare and verify that I am a shareholder of Abbott Laboratories as alleged in the attached Verified Shareholder Derivative Complaint ("Complaint"). I have reviewed the Complaint and authorized its filing. I verify that as to those allegations in the Complaint of which I have personal knowledge, I believe those allegations to be true to the best of my knowledge, information and belief. As to those allegations in the Complaint of which I do not have personal knowledge, I believe those allegations to be true, based on the discussions with and reliance upon my counsel and to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:

1/13/23

_____
ILENE LIPPMAN

1